**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES, | Criminal Case No. 13-29 (FSH) |
| v. | |
| MARTIN TREJO, | **OPINION** |
| Defendant. | September 29, 2014 |

**HOCHBERG, District Judge:**

After a one-week trial, a unanimous jury found the Defendant Martin Trejo guilty of transporting stolen property in interstate commerce in violation of 18 U.S.C. § 2314 and unlawful conspiracy in violation of 18 U.S.C. § 371. On September 17, 2014, the Defendant appeared before the Court for a sentencing hearing and received a sentence of 26 months. Because there is a substantial dispute between the Government and the Defendant regarding the calculation of the dollar value attributed to the crimes, the Court files this explanation of its determination of value.

**I.     BACKGROUND**

From 1998 until his arrest in July 2012, the Defendant worked as a contractor for the United States Citizenship and Immigration Services (USCIS) at the Western Forms Center in

1

California. The Center houses certain immigration forms, including Form I-797 Notice of Action. USCIS uses Form I-797 to communicate an immigration benefit to applicants and other agencies; particularly relevant in the instant case, state Departments of Motor Vehicles use it to verify a person's lawful presence in the United States. Starting in 2007, the Defendant stole blank Forms I-797 from USCIS and sold them to an intermediary, Karine Michmichian. On five occasions between 2007 and 2012, the Defendant sold batches of the forms—200 to 300 at a time—to the intermediary for resale. He was paid about $1,000 for each batch. He understood that the forms, which he was tasked with safeguarding, were Government immigration documents that the general public was not permitted to access. After transferring the forms, the Defendant had no further involvement. He did not know the identity of Michmichian's buyer. Nor was he aware of the buyer's particular purpose for the forms: that the stolen Forms I-797 were a significant component of a package of documents and services sold by a group of conspirators to fraudulently procure genuine driver's licenses for illegal aliens.

Once Michmichian received the forms, she marked up the price—to between $2,000 and $3,000 per batch—and resold the forms to a group of individuals led by Young-Kyu Park.[1] The blank forms were sent via Federal Express to members of the Park conspiracy in other states, including New Jersey. Park and his associates filled in the blank Forms I-797 with illegal aliens' personal information and inserted a false immigration status. Park then recorded a genuine

---

[1] In 2013, Park was convicted of, among other things, conspiracy to produce false identification documents.

receipt number—called an EAC number—on the illegal aliens' forms, which number corresponded to a different person who was granted a valid immigration status. Members of the Park conspiracy were able to obtain dozens of EAC numbers on the USCIS website and determine which numbers were valid and which were not.[2] As additional proof of identification, Park generated false bank statements using photo editing software. After completing the forms, a member of the Park conspiracy would accompany each illegal alien to a state Department of Motor Vehicles and guide them through the process of procuring a fraudulent—but genuine—driver's license. As a fee for this service, customers paid Park between $2,500 and $4,000. The process required one Form I-797 for each customer.

After an investigation by the FBI, on June 20, 2012 the Defendant was arrested and charged with stealing immigration forms from the Government. During post-arrest questioning by FBI agent Nathan Kim, the Defendant confessed that he had stolen batches of Forms I-797 on five occasions between 2007 and 2012, and had sold the forms to the intermediary Michmichian in exchange for about $1,000 per batch. The superseding indictment charged the Defendant with two counts. Count Five alleged a dual-object conspiracy in violation of 18 U.S.C. § 371, with the unlawful objects of the conspiracy including the theft of government property in violation of 18 U.S.C. § 641 and the transportation of stolen property in interstate commerce. It alleged that the Defendant conspired with Michmichian, Young-Kyu Park, and others, to steal government

---

[2] At trial, a witness for the Government testified that state DMV offices were only able to verify that any EAC number was valid, not the identity of the person assigned the particular EAC number. This security hole has now been rectified, according to the Government.

immigration forms and transmit them to various states. Count Six alleged that the Defendant violated 18 U.S.C. § 2314 by transporting stolen property in interstate commerce, to wit: batches of Forms I-797. Trial began on January 17, 2014, and the jury found the Defendant guilty on January 23, 2014.

## II.   THE PRESENTENCE REPORT

On May 20, 2014, the Court and the parties discussed the scope of the Defendant's agreement to undertake illegal conduct and the number of transactions attributable to him. After that hearing, a revised presentence report was prepared and delivered to the Court on June 13, 2014. The Probation Officer calculated a criminal history category of I, a base offense level of 6, a 2 level enhancement for abuse of a position of trust, a 2 level enhancement for the value of the loss, and an advisory guideline imprisonment range of 6 - 12 months. The Defendant raised no objections to the Presentence Report. The Government objected to the Probation Officer's calculation of the value of the stolen property at issue, or alternatively, moved for an upward variance based on the seriousness of the conduct and the need for general deterrence.

### III.   DISCUSSION

**(a)   The Process for Determining a Sentence**

Post- *Booker*,[3] a court is to follow a three step process in fashioning an appropriate sentence for a defendant:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*[;] (2) [i]n doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force[;] [and] (3) [f]inally, they are required to exercise their discretion by considering the relevant [18 U.S.C.] § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.
>
> *United States v. Lofink*, 564 F.3d 232, 237-38 (3d Cir. 2009) (quoting *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006)).

This Court will consider each of these steps in turn. In so doing, the Court will make findings as to disputed facts based on a preponderance of the evidence standard. *United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007) (en banc). The government bears the burden to prove the facts triggering a sentence enhancement. *United States v. Napier*, 273 F.3d 276, 279 (3d Cir. 2001).

**(b)   Guidelines Calculation**

The Government objects to the Probation Officer's loss calculation based on the market value the intermediary Michmichian received for the forms, arguing that the proper value of the

---

[3] *United States v. Booker*, 543 U.S. 220, 246 (2005).

5

forms is significantly higher. It asserts that: (1) the Defendant jointly undertook criminal activity with the Park conspiracy—which charged $2,500 to $4,000 per customer for a fraudulent license—allegedly resulting in a loss value of at least $2,500 per stolen form; or (2) the intrinsic market value of each blank Form I-797 is purportedly equivalent to the amount the conspiracy charged each customer to procure an illegal driver's license.

### 1. Scope Of Defendant's Jointly Undertaken Activity With The Park Conspiracy

In some circumstances, a defendant is accountable for the acts of others who are engaged in a jointly undertaken activity with the defendant. U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Gricco*, 277 F.3d 339, 356 (3d Cir. 2002). Specifically, the other individual's act must be: "(1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." *United States v. Robinson*, 603 F.3d 230, 233 (3d Cir. 2010) (internal quotation marks omitted). "A 'jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3 cmt. n.2.

A comment to the Guidelines explains the analysis of the scope of a defendant's agreement:

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant

6

> conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.
>
> U.S.S.G. § 1B1.3 cmt. n.2.

Accordingly, "whether an individual defendant may be held accountable for amounts of [contraband] involved in reasonably foreseeable transactions conducted by co-conspirators depends upon the degree of the defendant's involvement in the conspiracy." *United States v. Collado*, 975 F.2d 985, 994 (3d Cir. 1992).

Assessing the degree of the Defendant's involvement in the Park conspiracy, the Court first looks at the scope of the Defendant's agreement and finds that the fraudulent driver's-license scheme was not within "the scope of the specific conduct and objectives embraced by the defendant's agreement." *See* U.S.S.G. § 1B1.3, cmt. n.2. The Defendant was charged with—and convicted of—a conspiracy to steal Government forms and sell them in interstate commerce. Ample evidence established that the scope of Defendant's agreement included stealing Forms I-797 and transmitting them to an intermediary for resale. But the Government acknowledges that there is no evidence that the Defendant knew Park, nor interacted with him in any way, nor knew that the stolen forms would be used by Park and an entirely different set of conspirators charged

7

in a separate conspiracy to fraudulently procure genuine driver's licenses. Thus, the procurement of fraudulent licenses was not within the scope of the Defendant's illegal agreement, nor was it in furtherance of his illegal agreement with the intermediary to provide blank Forms I-797. These blank forms can be used to convey multiple forms of agency action, and thus one could not infer that the sale of these blanks forms would be tacitly understood to be for the driver's-license scheme. In sum, the Park driver's-license conspiracy's acts of filling in these blank forms as part of its criminal package of services to procure fraudulent licenses was not in furtherance of the scope of the agreement entered into by Defendant Trejo. Rather, the Defendant's agreement with the intermediary was to steal and resell forms. *See United States v. Mannino*, 212 F.3d 835, 841-42 (3d Cir. 2000) (reversing sentence that imputed co-conspirators' conduct to defendant as jointly undertaken activity and remanding for additional findings regarding the scope of defendant's agreement); U.S.S.G. § 1B1.3 cmt., illustration (c)(1). Thus, a loss value based on the price that the ultimate customers paid the Park conspiracy for the complete package of services, which permitted them to procure a fraudulent license, is not fairly attributed to Defendant Trejo because it was not within the scope of his criminal agreement.[4] *See United*

---

[4] The Government responds that "the value realized by Park as part of the broader criminal enterprise . . . was reasonably foreseeable to defendant." However, no evidence was adduced to suggest the foreseeability of this form of use. Moreover, even if the fee Park charged customers to procure a fraudulent license was reasonably foreseeable to the Defendant, he is nevertheless accountable only for acts within the scope of his agreement. *United States v. Collado*, 975 F.2d 985, 991 (3d Cir. 1992) (finding that the standard for assessing whether an act is within the scope of a defendant's agreement is "significantly more stringent" than the analysis of whether the act was in furtherance of the conspiracy and reasonably foreseeable); *United States v. Cabrera-Baez*, 24 F.3d 283, 288 (D.C. Cir. 1994) ("Mere foreseeability is not enough.").

8

*States v. Ekanem*, 555 F.3d 172, 176 (5th Cir. 2009) (holding that the defendant's awareness that a conspirator in one fraudulent Medicare scheme was operating a second fraudulent Medicare scheme was insufficient to find a jointly undertaken criminal activity with respect to the second scheme); *cf. United States v. Robinson*, 603 F.3d at 234 (inferring jointly undertaken criminal activity between defendant and another fraudulent check-casher because defendant engaged in fraudulent activity with the check-casher on two occasions).

      2. Intrinsic Value Of Form I-797

      The Government next asserts that the Defendant is accountable for the price each customer of the driver's-license scheme paid the Park conspiracy based on the intrinsic value of each form. Pursuant to the Sentencing Guidelines, the Court calculates the "loss" caused by Defendant as "[t]he fair market value of the property unlawfully taken . . . ." U.S.S.G. § 2B1.1 cmt. n.3.  Market value "will be determined by market forces the price at which the minds of a willing buyer and a willing seller would meet. If no commercial market for particular contraband exists, value may be established by reference to a thieves' market." *United States v. DiGilio*, 538 F.2d 972, 979 (3d Cir. 1976) (internal quotation marks and citations omitted).

      The Government argues that members of the Park conspiracy believed that Form I-797 was the "most important item" in the scheme to produce fraudulent licenses and, therefore, the price each customer paid for a license—$2,500 to $4,000—purportedly reflects the intrinsic market value of a single form. Thus, it contends that *United States v. Moore*, 571 F.2d 154, 156

(3d Cir. 1978), compels finding that the proper fair market value calculation is the price each customer paid multiplied by the total number of forms stolen by the Defendant. In *Moore*, the defendants transported stolen property—blank concert tickets—in interstate commerce, filled in the tickets, and then sold them to customers. *Id.* at 155. The Third Circuit found that the defendants "may have increased the value of the Ticketron blanks by their counterfeiting efforts, [but] did not by their actions so substantially alter the stolen blanks as to render the transported counterfeit tickets essentially different from what was stolen, within the meaning of § 2314." *Id.* at 157. Rather, the blank tickets were "so uniquely and intrinsically an essential element of, and an essential ingredient in, the defendants' unlawful activity, that the final value of the transported property (the counterfeit tickets) must necessarily be attributed in large part to the stolen blanks."[5] *Id.* However, the Court "express[ed] no opinion as to whether other fraudulent transactions, when tested by the above standard, may fall within or without the value requirement of § 2314." *Id.* at 157.

      Here, members of the Park driver's-license conspiracy sold a service to illegal aliens: guiding each customer through the process of illegally procuring a genuine driver's license. That final product is several steps removed from the stolen property, and includes many items of real added value beyond the blank forms. After receiving a blank Form I-797, Park and his associates collected customer information; procured false bank account statements on behalf of these

---

[5] The issue of whether a defendant could be held accountable for value added to stolen property after it had been transferred from the defendant's possession was not before the Court.

customers using photo editing software; fraudulently generated valid EAC numbers that corresponded to a person with a valid immigration status; and input all the information into the form. A member of the conspiracy then accompanied the customer—many of whom did not speak English—to a DMV to procure a driver's license using the Form I-797 and additional points of identification. Customers paid the $2,500 to $4,000 fee for the package of services. While the Form I-797 was an important part of the package, no evidence was adduced as to its value alone, disaggregated from the value of all the other parts of the package. Unlike in *Moore*, where the customers paid for filled-in versions of the stolen blank tickets, the customers here paid Park for more than just a filled-in Form I-797. Thus, the price does not merely reflect the intrinsic potential of the stolen property, nor can it "necessarily be attributed in large part to the stolen blanks." *Moore*, 571 F.2d at 157. This is particularly true where the blank government forms in this case have many potential uses beyond the driver's-license scheme, by contrast to concert ticket blanks, and no foreseeability of this particular use was shown by the evidence. While the form was a necessary part of the package needed to procure a driver's license, it was far from sufficient to obtain one, as all of the other documents and steps above indicate.

   The only remaining measure of value is the price that the intermediary Michmichian received for each transaction on the thieves' market. The testimony at trial was that Michmichian received "between [$2,000] and $3,000" for each transaction. As stated at the sentencing hearing, the Court adopts the Presentence Report's factual finding that the Defendant confessed

11

to five transactions from 2007 to 2012.[6] (Presentence Report ¶¶ 15, 17). Thus, the combined value of all five transactions is greater than $10,000 but less than $15,000, corresponding to a 4 level enhancement for stolen property valued at more than $10,000.[7] U.S.S.G. § 2B1.1(b)(1)(C). The Court also adopts the findings of the Presentence Report with respect to an enhancement for Defendant's abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. Accordingly, the Defendant's total offender level is 12 and his criminal history category is I, resulting in a guideline range of imprisonment of 10-16 months.

**(c)** **Variance**

The final step in determining a defendant's sentence is for the Court to consider the factors in 18 U.S.C. § 3553(a) based on the specific circumstances of the case and the defendant,

---

[6] FBI Agent Nathan Kim testified that the Defendant admitted to stealing forms and selling them to Michmichian in 2007, 2008, 2010, December 2011, and February 2012, consisting of about 200 forms per transaction. The Defendant did not object to this finding in the Presentence Report. The superseding indictment charged the Defendant with the transactions in 2010, 2011, and 2012.

[7] The Court includes the Defendant's uncharged conduct in its analysis of total loss because the Defendant's 2007 and 2008 transactions are part of the same overarching common scheme—involving the same type of stolen property, delivered to the same intermediary, in the same quantity, for the same price, and for the same purpose—as the charged conspiracy to steal and sell immigration forms. *See* U.S.S.G. § 1B1.3(a)(2), §1B1.3 cmt n.9(A). "[C]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." *United States v. Rudolph*, 137 F.3d 173, 177 (3d Cir. 1998) (quoting U.S.S.G. § 1B1.3).

imposing no greater sentence than the maximum statutory penalties provided for the offense.[8]

The Court must give "rational and meaningful consideration of the factors enumerated in 18

---

[8] Section 3553(a) requires consideration of the following factors:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

            (i) issued by the Sentencing Commission . . . , subject to any amendments made to such guidelines by act of Congress . . . ; and

            (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; . . .

    (5) any pertinent policy statement

        (A) issued by the Sentencing Commission . . . , subject to any amendments made to such policy statement by act of Congress . . . ; and

U.S.C. § 3553(a)" and make an "individualized assessment based on the facts presented." *United States v. Tomko*, 562 F.3d 558, 567-68 (3d Cir. 2009) (en banc) (internal quotation marks omitted). In considering the § 3553(a) factors, a court need not recite each and every factor, as long as it is clear that they were considered. *Rita v. United States*, 551 U.S. 338 (2007).

After balancing the § 3553(a) factors, the Court finds that a guideline sentence of 10 - 16 months for this Defendant to be seriously inadequate to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a). Rather, it is necessary to go outside the guideline range and increase the Defendant's sentence by 10 months to a sentence of 26 months of imprisonment in order to justly meet the criteria of § 3553(a).

This Court has seriously considered each and every one of the § 3553 factors and will discuss in detail those factors that weigh heavily in favor of this Court's decision to sentence Defendant Trejo above the Guidelines range.[9]

---

        (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

[9] The Court finds there are no mitigating factors that would justify varying downward on Defendant's sentence, and no such motion has been made by Defendant.

14

1.  Factors Weighing In Favor of Sentence Above Guidelines Range

  The first § 3553(a) factor requires this Court to consider "the nature and circumstances of the offense." As this Court discussed at the sentencing hearing, Defendant's crime was extraordinarily reckless. He stole protected Government forms that he knew the public was prohibited from accessing—in fact, part of his job as a material handler was to keep these forms from falling into the wrong hands. He sold these forms to an individual who was not permitted to have them—and whom he knew planned to resell the forms—without any concern for who might thereby gain access to blank government immigration forms or what someone might do with them. Moreover, the Defendant knew the nature of the forms: that they were used to convey immigration information. In selling Forms I-797, he knowingly exposed the community to grave risks from those who might use fraudulent immigration documents for illegal purposes. The Defendant's only reason for committing this serious crime, and jeopardizing the integrity of immigration enforcement, was greed. The circumstances of this offense demonstrate the Defendant's reckless disregard for the potential and actual consequences of his crime. His theft of forms was not an isolated incident attributable to a momentary lapse in judgment. Rather, it was a series of calculated thefts over a four-year period solely for Defendant's financial benefit. Although the Defendant has expressed his regret for these actions and has stated his commitment to improving himself for his family, these considerations are outweighed by the need to impose a sentence of imprisonment that demonstrates the serious consequences of the Defendant's reckless acts.

The Court also emphasizes "the need for the sentence imposed," § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, . . . and to provide just punishment for the offense," § 3553(a)(2)(A). The theft and sale of even a single Form I-797 is a serious crime because of what a person with unauthorized access can communicate—falsely—about anyone's immigration status or identity. The threat posed by those who illegally traffic in protected Government forms is severely understated by the Guideline range of 10 - 16 months, which was calculated based on the value of the stolen property. This crime is serious not because the forms fetch a certain price on the black market, but because the sale of forms undermines the security of the community and the Government's ability to enforce immigration laws. As such, it poses a far greater risk than most crimes related to transporting stolen property. There is no question that the Defendant's conduct created a serious security risk to the public, and in light of all the facts and circumstances, a just punishment must include a significant period of incarceration.

The Court also focuses on the need "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B). Slightly more than one year of imprisonment, as recommended by the Guidelines, is insufficient to generally deter Government employees and contractors who—like the Defendant—are motivated by greed and willing to abuse their access to protected Government assets for a price. The Court finds that there is a need for community members to recognize that this crime is taken seriously and for Government employees to understand that the consequence of the theft of Government documents includes a significant term of imprisonment.

2. Totality Of The § 3553(a) Factors

As the Court stated at the September 17, 2014, sentencing hearing, incarceration of the Defendant for 26 months is required to justly punish the Defendant, to deter similar conduct, to demonstrate the severity of the crime, and based on the nature of the crime. For this reason, the Court finds that the particular circumstances of this case require a sentence of 26 months of imprisonment. This is justified by the need to impose a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553.

## IV. CONCLUSION

Accordingly, Defendant Martin Trejo is sentenced to 26 months of incarceration, together with such other terms and conditions as were stated orally at the sentencing hearing on September 17, 2014. This Opinion regarding sentencing shall be attached to and incorporated by reference, in its entirety, into the Statement of Reasons and Judgment in this case.

**s/ Faith S. Hochberg**
**Hon. Faith S. Hochberg, U.S.D.J.**